|  |  |  |
|---|---|---|
| **R.B.**, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **Civil Action No. 18-662 (RMC)** |
| | ) | |
| **DISTRICT OF COLUMBIA,** | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION

R.B. is a teenager with learning disabilities whose parents sue the District of Columbia Public Schools (DCPS) on his behalf and for themselves. The Complaint alleges that DCPS failed to provide R.B. with the free appropriate public education (FAPE) to which he is legally entitled for the 2017-2018 school year. An independent hearing officer decided that DCPS properly prepared an Individualized Education Program (IEP) for R.B. that was reasonably tailored to his special education needs. Plaintiffs appeal, arguing that the hearing officer erred in ruling for DCPS on the appropriateness of R.B.'s IEP and school placement.

## I.    FACTS

Issued on February 14, 2018, the Hearing Officer Determination (HOD) denied Plaintiffs' claim that DCPS violated the Individuals with Disabilities Education Act (IDEA), as amended by the Individuals with Disabilities Education Improvement Act of 2004, 20 U.S.C. § 1400 *et seq.*, by failing to provide R.B. with a FAPE. IDEA provides that any party aggrieved by an HOD may seek redress through a civil action in state or federal court. *Id*. § 1415(i)(2). Plaintiffs ask the Court to find that R.B. was denied a FAPE in all the ways alleged in the Complaint, to declare that The Lab School of Washington (The Lab School), a private school

1

serving disabled students, is R.B.'s proper placement, and to order DCPS to reimburse R.B.'s tuition at The Lab School for the 2017-2018 school year.

R.B. is a District of Columbia resident. 2018 HOD, AR at 4.[1] He has been diagnosed with multiple learning disabilities, including Specific Learning Disability (SLD) and Other Health Impairment (OHI) due to Attention Deficit Hyperactivity Disorder (ADHD). *Id.*; *see also* 3/20/16 Confidential Comp. Psychological Re-Evaluation, AR at 77-118; 7/20/16 IEP Meeting Notes, AR at 194-99. His diagnosis means that R.B. is considered a "child with a disability" under IDEA, 34 C.F.R. § 300.8(c)(10)(i), and that he is entitled to an IEP. *Id.* § 300.323.

R.B. was first deemed eligible to receive special education services through DCPS in July 2016. 7/20/16 IEP Meeting Notes, AR at 194-99. Between 2014 and 2017, R.B.'s parents filed a series of administrative complaints against DCPS regarding R.B.'s special education status. The first complaint resulted in a settlement. The second and third complaints led to HODs in 2016 and 2017, with each finding that DCPS had denied R.B. a FAPE. The immediate HOD on appeal concluded that DCPS had met its obligations under IDEA; this February 2018 HOD is now before the Court on appeal by Plaintiffs.

**A. R.B.'s Early Education Years**

From kindergarten through fifth grade, R.B. attended Horace Mann Elementary School, part of DCPS. 3/20/16 Confidential Comp. Psychological Re-Evaluation, AR at 77. While R.B. was at Horace Mann, his parents were concerned about his writing skills, homework completion, and his stress and anxiety levels about school. On November 6, 2013, DCPS

---

[1] Citations to the Administrative Record [Dkts. 14 and 15] reflect the document title and the administrative record page number.

convened a student support team to discuss R.B.'s ongoing difficulties.  *See* 2016 HOD, AR at 53.

In December 2013 and early January 2014, R.B. was evaluated by an independent psychologist.  The psychologist found that R.B. demonstrated weaknesses in areas of attention and executive function, spelling, written language, phonological processing, and fine motor skills, and showed increased levels of depression.  2016 HOD, AR at 53.  The psychologist diagnosed R.B. with ADHD combined type, a disorder of written language, and developmental coordination disorder.  The psychologist recommended that R.B. be provided with an IEP, as well as targeted remediation and classroom and testing accommodations.  *Id.*

R.B.'s parents submitted the independent psychologist's report to DCPS in February 2014.  A psychologist employed by DCPS conducted her own evaluation that included a review of R.B.'s academic records, student and teacher interviews, and classroom observations.  *Id.* at 58-59.  The DCPS psychologist concluded that R.B. did not require an IEP, in part because R.B. had not demonstrated consistent below-grade-level performance.  *Id.* at 59.

**B. The 2014 Due Process Complaint and Settlement**

DCPS held an eligibility meeting concerning R.B. on May 6, 2014.  DCPS told R.B.'s parents that it found R.B. to be ineligible for special education services.  However, DCPS proposed that R.B. be provided with a Section 504 plan.  *Id.*  A Section 504 plan, named after the section of the Rehabilitation Act in which it was established, *see* Pub. L. No. 93-112, 87 Stat. 355 (codified as amended in 29 U.S.C. § 794), "is designed to assist students with learning or behavior problems even if they do not qualify for an Individualized Education Plan (IEP) under the IDEA."  *Horne v. Potomac Preparatory P.C.S.*, No. 15-cv-115, 2016 WL 3962788, at *2 n.2 (D.D.C. July 20, 2016).  DCPS recommended a Section 504 plan for R.B. that would include

occupational therapy services, behavioral support services, and various accommodations. R.B.'s

parents declined such a plan. 2016 HOD, AR at 54; *see also* 3/20/16 Confidential Comp.

Psychological Re-Evaluation, AR at 77.

Instead, on May 19, 2014, R.B.'s parents filed a due process complaint under

IDEA challenging the conclusion that R.B. was ineligible for special education services. 2016

HOD, AR at 59. R.B.'s parents also notified DCPS that they intended to seek public funding for

R.B. to attend a private school. *Id.* R.B.'s parents subsequently placed him in The Lab School, a

special education day school that exclusively serves students with disabilities. *See* 2018 HOD,

AR at 7, 10; *see also* 2/1/18 Hearing Tr., AR at 688. R.B. enrolled at The Lab School at the

beginning of the 2014-2015 school year, when R.B. entered sixth grade.

In October 2014, DCPS settled the 2014 due process complaint filed by R.B.'s

parents. 2016 HOD, AR at 60. DCPS agreed to fund R.B. at The Lab School for the 2014-2015

school year and to assess R.B.'s eligibility for special education services by the end of April

2015. *Id.*

### C. The 2016 HOD

DCPS convened an eligibility meeting concerning R.B. in January 2015. *Id.* at

61. DCPS again determined that R.B. was ineligible for special education services and offered to

develop a Section 504 plan for R.B. *Id.* at 62. R.B.'s parents again declined a Section 504 plan

and filed another due process complaint. R.B.'s parents sought a determination that DCPS had

denied R.B. a FAPE and also sought reimbursement for R.B.'s placement at The Lab School for

the 2015-2016 school year. *Id.* at 54.

The HOD was issued on January 3, 2016; it found that DCPS had failed to

evaluate R.B. sufficiently to determine his eligibility for special education services, *id.* at 65, and

that further testing of R.B. was required, since the evidence in the record did not establish R.B.'s eligibility for an IEP. *Id.* at 66-68. The HOD ordered the District to determine R.B.'s eligibility within 75 calendar days and, if R.B. were determined to be eligible, to develop an IEP within 30 days. *Id.* at 70. It further ordered DCPS to fund R.B.'s enrollment at The Lab School for the 2015-2016 school year. *Id.* at 70-71.

### D. The 2017 HOD

On July 20, 2016, after several rounds of testing, DCPS found R.B. to be eligible for special education services as a student with multiple disabilities including SLD and OHI. *See* 7/20/16 IEP Meeting Notes, AR at 194-99. Thereafter, DCPS proposed an IEP for R.B. that would have provided 10 hours per week of specialized instruction "inside of general education," 60 minutes per month of behavioral support services "outside of general education," and 240 minutes per month of occupational therapy split evenly between inside and outside general education.[2] 2017 HOD, AR at 232. DCPS indicated that R.B.'s likely placement would be at Deal Middle School, a public school within DCPS. *See id* at 233; *see also* Pls.' Mot. for Summ.

---

[2] According to DCPS's Special Education Resource Guide, "inside of general education" means that the specialized instruction and related services for students with disabilities are served while they are with their peers without disabilities in the general classroom. "Outside of general education" refers to all specialized instruction and services that are provided to a class or grouping made up entirely of students with disabilities. *See* Special Education Programs & Resources Guide for Families, School Year 2017-2018 (Resource Guide) at 3, *available at* https://dcps.dc.gov/sites/default/files/dc/sites/dcps/publication/attachments/Family%20Programs%20and%20Resources%20Guide%2017-18_1.pdf (last visited Sept. 26, 2019).

The Court takes judicial notice of this publicly available DCPS brochure, as the accuracy of DCPS's policies as published in its own brochure cannot reasonably be questioned. *See* Fed. R. Evid. 201(c); *see also Washington Post v. Robinson*, 935 F.2d 282, 291 (D.C. Cir. 1991) (taking judicial notice of newspaper articles in the Washington, D.C. area); *Agee v. Muskie*, 629 F.2d 80, 81 n.1, 90 (D.C. Cir. 1980) (taking judicial notice of facts generally known because of newspaper articles).

J. (Pls.' Mot.) [Dkt. 16] at 9.  The parents disagreed with the proposed IEP, maintaining that R.B should not be placed in a general education setting.  2017 HOD, AR at 233.  They also objected that the IEP did not provide for speech and language services.  *Id.*

R.B.'s parents filed another due process complaint in August 2016 and a due process hearing was held in February 2017.  *Id.* at 226-27.  The HOD was issued on February 20, 2017, in which the hearing officer agreed with R.B.'s parents in part.  *See id.* at 225-50.  While the HOD found that R.B. was ineligible for speech and language services, it also found that R.B.'s IEP was inappropriate because the proposed quantity and method of specialized instruction were deficient.  The HOD noted that the average general education class size in which R.B. would be placed at Deal consisted of approximately 20 students, *id.* at 240, but "found the opinions of the Parents' experts, that [R.B.] requires full-time specialized instruction in a small classroom setting, more credible than the contrary opinion of [the] DCPS Specialist that [R.B.] could be adequately served in the general education setting."  *Id.* at 242.

Nevertheless, the hearing officer was not persuaded "that [R.B.'s] least restrictive environment is a special school like [The Lab School], where there are no typically developing peers."  *Id.* at 247.  He "expressly [did] not find that [R.B.] could not receive educational benefits in a small, structured classroom in a traditional public school."  *Id.*

As a remedy, the HOD ordered DCPS to hold an IEP meeting before May 31, 2017, and to revise R.B.'s IEP in conformity with the 2017 HOD.  It further ordered DCPS to fund R.B.'s placement at The Lab School for the 2016-2017 school year.  *Id.* at 248.

### E. The 5/1/17 IEP

Pursuant to the 2017 HOD, DCPS held an IEP meeting for R.B. on May 1, 2017.

5/1/17 IEP Meeting Notes, AR at 270-85. The meeting included participants from DCPS and

The Lab School, as well as R.B.'s family and representatives. *See id.* at 282.

That meeting resulted in a revised IEP that would have provided R.B. with 25.5

hours of specialized instruction per week, 120 minutes per month of behavioral support services,

and 360 minutes per month of occupational therapy, all to be provided outside general education.

5/1/17 IEP, AR at 287-314. The IEP also required the following classroom aids and services:

> Extended time, advance notice of tests, calculator, extra
> processing/wait time, mark on test, location with minimal
> distractions, preferential seating close to the point of instruction and
> with minimal distractions, repetition of oral and written directions,
> small group setting, word processing software with spell-check
> features, word bank, flexibility in scheduling, frequent breaks, grid
> paper for math, simplified visual field, cues to wear glasses.

*Id.* at 310. During the meeting, DCPS stated that R.B. would have lunch and electives in the

general education setting. 5/1/17 IEP Meeting Notes, AR at 278.

R.B.'s representatives agreed with most of the provisions of the IEP. 2018 HOD,

AR at 9. However, they objected to R.B. having lunch and electives with non-disabled peers.

They also expressed concern that the IEP did not provide for speech and language services.

5/1/17 IEP Meeting Notes, AR at 278-79. DCPS disagreed and advised that a school assignment

would be forthcoming. *Id.* at 279.

On May 24, 2017, R.B. received a letter from DCPS stating that his school

placement would be Woodrow Wilson High School (Woodrow Wilson HS) for the 2017-2018

school year. 5/24/17 DCPS Location of Services Letter, AR at 317. The letter stated that

"Woodrow Wilson HS has the programming in place for the 2017-2018 school year to meet

[R.B.'s] IEP needs." *Id.*  The letter further explained that "[Woodrow Wilson HS has] . . . space available in the Specific Learning Support . . . classroom for [R.B.'s] next grade level." *Id.*

The Specific Learning Support (SLS) program is for students with learning disabilities or challenges "where behavior is not the primary impediment to access the general education curriculum."  Resource Guide at 18.  SLS classrooms provide special education to students whose IEPs require 20 or more hours of specialized instruction.  *See id.* at 3.  SLS students typically learn their "core content" in an SLS classroom, each of which is staffed with a certified special education teacher and a paraprofessional.  *See id* at 18.

### F.  The 2018 HOD

Plaintiffs disagreed with R.B.'s placement at Woodrow Wilson HS and notified DCPS that R.B. would remain at The Lab School for the 2017-2018 year, his ninth-grade year. 8/7/17 Letter re: Student's attendance to The Lab School, AR at 376-77.  Plaintiffs asked DCPS to continue paying for R.B.'s attendance at The Lab School but DCPS said it would not do so because it had offered R.B. a FAPE.  8/14/17 Letter from DCPS to Parents Re: Private Placement, AR at 378.

R.B.'s parents filed another due process complaint on August 17, 2017.  8/17/17 Due Process Complaint Notice, AR at 380-93.  The complaint alleged that DCPS denied R.B. a FAPE by failing to propose an appropriate IEP and placement and by failing to find R.B. eligible for speech and language services.  DCPS responded to the complaint on November 6, 2017. 11/6/17 DCPS Response to Due Process Complaint, AR at 422-25.  The school held a resolution session on November 9, 2017, but the parties were unable to resolve the matter.  11/13/17 Resolution Period Disposition Form, AR at 427-30.  The matter was then presented to an independent hearing officer on February 1 and 2, 2018.

Plaintiffs presented five witnesses: (1) R.B.'s mother; (2) Amy Mounce, R.B.'s educational consultant; (3) Donna Pavluk, speech-language pathologist at The Lab School; (4) Judy Shincarick, occupational therapist at The Lab School; and (5) Dr. Jennifer Durham, Academic Dean at The Lab School. 2018 HOD, AR at 6 n.7, 21-22; *see also* 2/1/18 Hearing Tr., AR at 687. DCPS also presented five witnesses: (1) Kimberly Martin, principal at Woodrow Wilson HS; (2) Monica Kurude, special education coordinator at Woodrow Wilson HS; (3) Shannon Sterling-Hunter, DCPS special education progress monitor; (4) Travis Bryant, special education specialist at DCPS; and (5) Delisa Green, speech language pathologist at DCPS. 2018 HOD, AR at 6 n.7, 21-22. Following the hearing, the parties submitted closing briefs. *See* Pet'rs' Closing Br., AR at 503-13; DCPS's Closing Br., AR at 516-26.

The HOD was issued on February 14, 2018. 2018 HOD, AR at 3-22. It reached three "conclusions of law": (1) R.B.'s parents did not show that DCPS had denied R.B. a FAPE by failing to find him eligible for speech and language services in 2017-2018; (2) DCPS showed that the IEP developed for R.B. for 2017-2018 was appropriate under the circumstances; and (3) DCPS showed that the school placement offered for R.B. for 2017-2018 was appropriate to implement his IEP. *Id.* at 12-17. Thus, the hearing officer denied Plaintiffs' request to place and fund R.B. at The Lab School for 2017-2018. *Id.* at 18.

The Complaint in this matter was filed on March 23, 2018. Count I alleges that DCPS failed to provide R.B. with a FAPE for the 2017-2018 school year. Count II alleges that DCPS failed to provide an appropriate placement for R.B for the 2017-2018 school year. Count III alleges that the hearing officer violated Plaintiffs' due process rights by committing factual and legal errors in the February 2018 HOD. Plaintiffs seek an order from the Court: (1) vacating the 2018 HOD and ordering DCPS to reimburse Plaintiffs for the cost of R.B.'s

attendance at The Lab School for the 2017-2018 school year; (2) ordering DCPS to place and fund R.B. at The Lab School and declare it to be his current educational placement under IDEA; and (3) ordering reasonable attorneys' fees and costs. The matter has been fully briefed and is ripe for decision.[3, 4]

## II. LEGAL STANDARD

"The Individuals with Disabilities Education Act (IDEA or Act) offers States federal funds to assist in educating children with disabilities." *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 993 (2017) (citing 84 Stat. 175, as amended, 20 U.S.C. § 1400 *et seq.*). Under IDEA, a state receiving funds must provide a FAPE to all eligible children. 20 U.S.C. § 1412(a)(1); *see also Leggett v. District of Columbia*, 793 F.3d 59, 62 (D.C. Cir. 2015) ("[E]very child with a disability in this country is entitled to a 'free appropriate public education,' or FAPE.") (citation omitted). Children determined eligible for special education services under the Act receive an IEP, which provides the blueprint for the special education and related services to be provided, and which must be "tailored to the unique needs" of each eligible child and updated regularly. *Bd. of Ed. of Hendrick Hudson Cen. Sch. Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 181 (1982).

The Supreme Court has held that "to meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress

---

[3] *See* Pls.' Mot.; Def.'s Opp'n. to Pls.' Mot. for Summ. J., and Cross Mot. for Summ. J. (Def.'s Opp'n and Cross Mot.) [Dkt. 19]; Pls.' Opp'n to Def.'s Mot. for Summ. J. and Pls.' Reply to Def.'s Opp'n to Pls.' Mot. for Summ. J. (Pls.' Reply) [Dkt. 22]; Def.'s Reply to Pls.' Opp'n to Def.'s Cross Mot. for Summ. J. (Def.'s Reply) [Dkt. 24].

[4] On July 23, 2018, Plaintiffs filed a motion to introduce additional evidence. Pls.' Mot. for Additional Evidence [Dkt. 10]. Plaintiffs asked to supplement the record with an observation report of Ms. Sterling-Hunter, DCPS special education progress monitor who observed R.B. in class three months after the 2018 HOD hearing. On October 4, 2018, the Court granted the motion and accepted the new evidence. Order [Dkt. 14].

appropriate in light of the child's circumstances." *Endrew F.*, 137 S. Ct. at 999. "To the maximum extent appropriate," the school must educate the child in the "[l]east restrictive environment," or, in other words, "with children who are not disabled." 20 U.S.C. § 1412(a)(5)(A).

If a parent of a student with a disability is dissatisfied with a school district or agency's "identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child," 20 U.S.C. § 1415(b)(6), IDEA entitles them to present their arguments in an "impartial due process hearing." *Id*. § 1415(f). At that hearing, the parties may present evidence and expert testimony about the child's educational and functional needs. *Id*. § 1415(f), (h). After the hearing, an independent hearing officer issues an HOD, which determines whether a school district denied the student a FAPE and, if so, orders an appropriate remedy. *Id*. § 1415(f)(3)(E); *see also B.D. v. District of Columbia*, 817 F.3d 792, 797-98 (D.C. Cir. 2016). Any party aggrieved by the hearing officer's determination may bring a civil action in state or federal court. 20 U.S.C. § 1415(i)(2).[5]

Although motions for review of an HOD are styled as motions for summary judgment, the court does not follow "a true summary judgment procedure." *L.R.L. ex rel. Lomax v. District of Columbia*, 896 F. Supp. 2d 69, 73 (D.D.C. 2012) (citation omitted). Instead, a motion for summary judgment in this context operates as a motion for judgment on the administrative record and on any additional evidence presented by the parties. *D.R. ex rel. Robinson v. District of Columbia*, 637 F. Supp. 2d 11, 16 (D.D.C. 2009).

---

[5] The parties do not contest that this Court has original jurisdiction over this matter, and the District of Columbia is the proper venue. *See* 20 U.S.C. § 1415(i)(3)(A); 28 U.S.C. § 1331.

A party challenging a hearing officer's administrative determination "must at least take on the burden of persuading the court that the hearing officer was wrong." *See Kerkam v. McKenzie*, 862 F.2d 884, 887 (D.C. Cir. 1989). "While the court must make an independent determination, the court also should give due weight to the decision of the hearing officer and should afford some deference to the expertise of the hearing officer and the school officials." *D.K. v. District of Columbia*, 983 F. Supp. 2d 138, 144 (D.D.C. 2013) (citation omitted). Despite this instruction, a court affords somewhat less deference to HODs in the context of IDEA than is conventional for most other administrative proceedings. *Reid ex rel. Reid v. District of Columbia*, 401 F.3d 516, 521 (D.C. Cir. 2005). "Moreover, a hearing decision without reasoned and specific findings deserves little deference." *Id.* (citation omitted). "Nevertheless, the Court should 'defer to the [hearing officer's] factual findings unless it can point to contrary nontestimonial extrinsic evidence on the record.'" *Savoy v. District of Columbia*, 844 F. Supp. 2d 23, 30 (D.D.C. 2012) (citation omitted).

Determining whether an IEP is substantively adequate requires a "fact-intensive" inquiry, as "crafting an appropriate program of education" for a given child entails "the expertise of school officials" as well as "the input of the child's parents or guardians." *Endrew F.*, 137 S. Ct. at 999. "The key inquiry . . . is whether, taking account of what the school knew or reasonably should have known of a student's needs at the time, the IEP it offered was reasonably calculated to enable the specific student's progress." *Z.B. v. District of Columbia*, 888 F.3d 515, 524 (D.C. Cir. 2018). Reviewing courts "may fairly expect [school] authorities to be able to offer a cogent and responsive explanation for their decisions that shows that the IEP is reasonably calculated to enable the child to make progress appropriate in light of his circumstances." *Endrew F.*, 137 S. Ct. at 1002.

An IEP must be evaluated in light of the information available when it was "created," not "with the benefit of hindsight." *Z.B.*, 888 F.3d at 542 (citation omitted). However, "evidence that post-dates the creation of an IEP is relevant to the inquiry to whatever extent it sheds light on whether the IEP was objectively reasonable at the time it was promulgated." *Id.* (internal quotation marks and citation omitted).

IDEA authorizes retroactive reimbursement to parents for private-school expenses under certain circumstances. *Leggett*, 793 F.3d at 64. School districts must "reimburse parents for their private-school expenses if[:] (1) school officials failed to offer the child a [FAPE] in a public or private school; (2) the private-school placement chosen by the parents was otherwise 'proper under the [IDEA]'; and (3) the equities weigh in favor of reimbursement." *Id.* at 66-67 (citing *Florence Cty. Sch. Dist. Four v. Carter By and Through Carter*, 510 U.S. 7, 15-16 (1993)).

## III. ANALYSIS

Plaintiffs advance two basic complaints about R.B.'s education. Plaintiffs argue that the May 1, 2017 IEP is deficient because it calls for R.B. to spend lunch and electives in a general education setting. Plaintiffs further assert that Woodrow Wilson HS is an inappropriate school placement for R.B due to Wilson's large-school environment and the quality of Wilson's special education instruction. Plaintiffs contend that the hearing officer made factual and legal errors in ruling for DCPS on the appropriateness of the IEP and school placement in the 2018 HOD.[6] As relevant to both the IEP and the placement at Woodrow Wilson HS, Plaintiffs challenge an absence of assistive technology.

---

[6] Plaintiffs do not address the hearing officer's finding that R.B. was not entitled to speech and language services. *See* 2018 HOD, AR at 13-14. The Court finds that Plaintiffs have conceded this issue by failing to address or rebut the District's arguments made in the District's Cross-

## A. Claim One: Failure to Develop an Appropriate IEP

### 1. *General Education Setting for Lunch and Electives*

The IEP that DCPS proposed for R.B. in May 2017 called for 25.5 hours of specialized instruction per week; 120 minutes per month of behavioral support services; and 360 minutes per month of occupational therapy, all to be provided outside general education. *See* 5/1/17 IEP, AR at 310. These combined programs totaled an approximate average of 27.25 hours per week,[7] which the District considers to be a full-time IEP. *See* Resource Guide at 31 ("An IEP with 20 or more hours of specialized instruction outside of the general education environment is considered full-time.").

Under the May 2017 IEP, R.B.'s placement in a general education setting would amount to, approximately, five-and-a-half hours per week. *See* 2018 HOD, AR at 11. Of these five-and-a-half hours, R.B. would spend about three-and-one-half hours per week in lunch and two hours per week in electives such as art, music, and gym.[8] *See id; see also* 2/1/18 Hearing Tr., AR at 795-96.

---

Motion for Summary Judgment. *See* Fed. R. Civ. P. 56(e)(2) ("If a party fails to . . . properly address another party's assertion of fact . . ., the court may . . . consider the fact undisputed[.]").

[7] The hearing officer explained that this calculation of 27.25 hours was based on R.B.'s May 1, 2017 IEP. 2018 HOD, AR at 11. The total number of weekly hours outside of general education (specialized instruction, behavioral support services, and occupational therapy) is not specified in the IEP, because behavioral support services and occupational therapy are calculated on a monthly basis. *See* 5/1/17 IEP, AR at 310. Plaintiffs have not challenged the hearing officer's calculation. The Court defers to the hearing officer's finding that the IEP would have provided, on average, approximately 27.25 weekly hours of instruction outside general education.

[8] Monica Kurude, the special education coordinator at Woodrow Wilson HS, testified that foreign language is also an elective offered for students in grades 10 through 12. Students must take two courses in a foreign language to fulfill graduation requirements. 2/2/18 Hearing Tr., AR at 817.

Plaintiffs contend that the IEP was deficient because it did not prescribe specialized instruction for lunch and electives. *See* Pls.' Mot. at 18. Plaintiffs stress that lunchtime is a period during which R.B. requires "*the most* support." *Id.* Their concern is consistent with a point made during the May 1, 2017 IEP meeting, when The Lab School staff expressed concern that R.B. "[r]equires [a] tremendous amount of support and redirection throughout his day . . . . In [the] lunchroom, [we] must redirect [him] the most." 5/1/17 IEP Meeting Notes, AR at 278. During that discussion in May 2017, one of The Lab School representatives recounted an incident where R.B. poured water in a fellow student's salad dressing. *See id; see also* 2/2/18 Hearing Tr., AR at 924. During the February 2018 due process hearing, R.B.'s mother testified that she had, in previous school years, received calls from The Lab School about R.B. disrupting lunch. However, she had not received such calls during the 2017-2018 school year. 2/1/18 Hearing Tr., AR at 787.

Witnesses for both sides testified that lunchtime at both school environments is, to a degree, unstructured. Ms. Sterling-Hunter, DCPS special education progress monitor, characterized lunch as "downtime" and stated that "for the most part students are able to be independent during lunch." 2/2/18 Hearing Tr., AR at 887-88. Ms. Kurude testified that students at Woodrow Wilson HS also have choices about where to eat lunch. *Id.* at 819. Students may sit in the atrium with classmates, eat in a classroom, or eat in the cafeteria. An aide accompanies SLS students who eat in the cafeteria. *Id.* Dr. Durham, Academic Dean of The Lab School, testified that ninth graders can choose to eat lunch in different locations in the building, while tenth through twelfth graders are permitted to walk off campus with staff supervision. *Id.* at 719-20.

Additionally, Plaintiffs argue that R.B. would have difficulty functioning in a general education setting for electives such as art, music, and recess. For instance, the minutes of R.B.'s May 1, 2017 IEP meeting capture the following comment about recess: "[R.B.] [o]ut to recess – pushes envelope. Provide a lot of support throughout the day. In a larger setting, would get into a lot of trouble." 5/1/17 IEP Meeting Notes, AR at 278; *see also* 2/1/18 Hearing Tr., AR at 630. Moreover, during the due process hearing, Ms. Mounce, R.B.'s educational consultant, expressed concern about a particular art class that she had observed at Woodrow Wilson HS. 2/1/18 Hearing Tr., AR at 653-54, 659. She stated that the class had around twenty-eight to thirty students and that "half the students were not on task and they were very loud and talking." *Id.* at 654. Ms. Mounce testified that she did not believe R.B. could be appropriately educated in such a class because he would not be able to pay attention. *Id.*

Other witnesses for Plaintiffs stated similar concerns. Dr. Durham noted R.B.'s "sensory issues" and asserted that a classroom of twenty other students "would be really difficult for him." *Id.* at 708. Ms. Pavluck, speech-language pathologist at The Lab School, stated that she did not know "how the teacher could have the time and patience, [how] she'll be able to accommodate [R.B.'s] needs because he is needy." *Id.* at 768.

In contrast, witnesses for DCPS testified that R.B. did not need to be removed completely from the general education setting. Travis Bryant, special education specialist for DCPS, testified about the development of R.B.'s IEP. He noted that during R.B.'s IEP meeting, participants discussed R.B.'s progress in academic areas including mathematics, reading, and writing. 2/1/18 Hearing Tr., AR at 914-17. At the time of the meeting in May 2017, R.B. was testing at one grade level below his grade in each of these subjects. Mr. Bryant explained that DCPS prescribed 25.5 hours of specialized instruction outside general education to help "bring

R.B. up to grade level [functioning]" in these areas. *Id.* at 922. However, Mr. Bryant stated that beyond these academic subjects, the DCPS team did not feel that isolating R.B. from non-disabled peers was appropriate. Mr. Bryant noted that "there are benefits to [R.B.] for socialization and his social-emotional needs to still be around non-disabled peers." *Id.* at 923.

Mr. Bryant explained that he recommended Woodrow Wilson HS for R.B. based on his review of R.B.'s 2016 psychological evaluation,[9] academic data from The Lab School, and a classroom observation of R.B. *Id.* Mr. Bryant visited R.B.'s reading class on one occasion during the 2017-2018 school year, prior to the due process hearing. *Id.* at 909. He observed no behavioral issues with R.B. during the class. *Id.* at 911.

Ms. Sterling-Hunter observed R.B. at The Lab School on two occasions during the 2017-2018 school year. One of the visits occurred prior to the due process hearing and the other took place after the HOD was issued. Ms. Sterling-Hunter first observed R.B. in an English class. She testified that "[R.B.] was on-task for the most part" and "seemed to get along with his peers." *Id.* at 891-93. She considered R.B.'s behavior to be "typical [of] how students his age or children his age would engage with one another and nothing was abnormal or odd." *Id.* at 893-94. She opined that R.B "would be able to interact typically with people his age," either in a classroom setting or socially. *Id.* at 894.

Ms. Sterling-Hunter's second observation took place in May 2018, three months after the HOD decision was rendered, when she attended a Spanish-language class. Her observation notes described behavioral concerns about R.B. Her notes stated that "[f]rom the start of the period [R.B.] was observed interrupting the teacher by asking the teacher repetitive

---

[9] The 2016 psychological evaluation was conducted by Dr. Tina S. Nguyen, DCPS Certified School Psychologist. *See* 3/20/16 Confidential Comp. Psychological Re-Evaluation, AR at 77-118.

questions in a loud, elevated tone regarding the next school year." Ex. 1 at 1, Pls.' Mot. for Additional Evidence [Dkt. 10-2]. The teacher "would briefly give an answer to the question then redirect [R.B.] back to the topic of discussion," but R.B. "continued to interrupt the teacher by asking questions and making comments that reflected blurting and impulsivity." *Id.* The notes stated that "[R.B.'s] frequency of blurting decreased significantly when paired with his teacher for 1:1 instruction." *Id.*

While recognizing some inconsistency in the evidence, the Court concludes that the HOD was well supported in all respects except relating to assistive technology; its conclusion that R.B.'s 2017-2018 IEP was appropriately tailored to his special education needs with respect to the type and amount of R.B.'s special education hours is fully explained. The Administrative Record shows there was professional disagreement about whether R.B. could handle being with general education students at lunch and elective classes but the Court agrees with the HOD that DCPS reasonably concluded that such scheduling would fulfill the statutory mandate that special education students be taught in the least restrictive environment. Thus, the IEP required Woodrow Wilson HS to allow R.B. to receive all specialized instruction and training in the SLS program but still be, "[t]o the maximum extent appropriate, . . . educated with children who are not disabled." *See* 20 U.S.C. § 1412(a)(5)(A).

The record evidence, as a whole, indicates that R.B. had sufficient social skills to benefit from interacting with non-disabled children at lunch and in a general education classroom for elective classes. His 2016 psychological evaluation reported that "[R.B.] can build and maintain relationships with his peers and teacher." 3/20/16 Confidential Comp. Psychological Re-Evaluation, AR at 108. The evaluation further stated that "[R.B.'s] teachers reported that [he] has friends in class and has good social relationships. He gets along well with his peers.

There are no current concerns regarding social relationships." *Id.* Moreover, on the two occasions that DCPS representatives observed R.B. in a classroom setting before the 2018 HOD hearing, R.B. did not demonstrate behavioral issues.

This evaluation supported the IEP provisions for R.B. to receive limited exposure to a less restrictive environment than a school attended only by disabled children. At the same time, the IEP was geared to improving R.B.'s academic deficiencies by requiring that all of R.B.'s core academic classes take place in a specialized setting. The IEP included several supplementary aids and services for use in electives where R.B. would interact with non-disabled peers. *See* 5/1/17 IEP, AR at 310. It also included monthly behavioral support services and occupational therapy services to support R.B.'s behavioral and functional development.

The IEP was consistent with the 2017 HOD, which stated that R.B. required a "small, structured classroom," although the hearing officer was not convinced that R.B.'s least restrictive environment was a private school such as The Lab School. 2017 HOD, AR at 247. The 2017 HOD ordered DCPS to develop an IEP in conformity with its conclusions. *Id.* at 248. The Court agrees with the 2018 HOD that, "based on the evidence presented [at the hearing]. . . DCPS did just that," 2018 HOD, AR at 15, save for addressing assistive technology as discussed below.

Plaintiffs argue that the hearing officer made errors in the 2018 HOD by "relying on DCPS witnesses who had limited knowledge, failed to apply their expertise to R.B., and offered no cogent or responsive explanations for their decisions." Pls.' Mot. at 2. The Court disagrees. The hearing officer considered the testimony presented by both sides and properly found that DCPS had sustained its burden regarding R.B.'s IEP. The hearing officer's findings were "reasoned and specific," *Reid ex rel. Reid*, 401 F.3d at 521, and should be afforded some

deference. *D.K.*, 983 F. Supp. 2d at 144. Moreover, Plaintiffs' argument that DCPS failed to offer "cogent and responsive explanations" for their decisions is without merit. Plaintiffs point out perceived inconsistencies in the testimony of Ms. Kurude, special education coordinator at Woodrow Wilson HS, which the hearing officer recognized. But Ms. Kurude was not involved in crafting R.B.'s IEP and was not asked to explain decisions related to it.[10] *See Endrew F.*, 137 S. Ct. at 1002. That task fell primarily to Mr. Bryant, the only DCPS witness who participated in R.B.'s IEP meeting. Mr. Bryant offered cogent and responsive testimony on this topic. *See* 2/2/18 Hearing Tr., AR at 914-23.

There is no overlooking the fact that Ms. Sterling-Hunter observed negative behaviors by R.B. in a classroom, three months after the HOD was rendered. To be sure, Ms.

---

[10] Plaintiffs' main concern with Ms. Kurude's testimony was her statement that students in the high school's SLS program function at more than four to five years below their grade level. Pls.' Mot. at 33; *see* 2/2/18 Hearing Tr., AR at 826-27. Ms. Kurude further testified that the SLS program would be appropriate for R.B., who, she understood, was functioning far below grade level. 2/2/18 Hearing Tr., AR at 826-27. She later clarified her testimony by stating that the SLS program includes "a range of" academic abilities. *Id.* at 874.

Ms. Kurude was mistaken about R.B.'s grade-level performance, since R.B. was only testing at one grade-level below his actual grade in mathematics, reading, and writing. *Id.* at 922. Ms. Kurude was also imprecise in her description of the SLS program while Kimberly Martin, the principal of Woodrow Wilson HS, testified that the SLS program consists of students with a wide range of academic levels, including students who are performing close to grade level. *Id.* at 879.

The hearing officer recognized that there were inconsistencies in Ms. Kurude's testimony. *See* 2018 HOD, AR at 17 ("Albeit the [Woodrow Wilson HS special education coordinator] first stated that the students in the program are far below grade level, she later corrected her testimony . . . .") However, he found "scant evidence to support Petitioner's contention that the peer group [R.B.] would encounter in [Wilson's] SLS program would not be at or near [R.B.'s] academic functioning level." *Id.* In contrast, the HOD credited Ms. Martin's testimony about the SLS program. *Id.* The Court will defer to the hearing officer's finding that Ms. Martin was credible and that the SLS program includes "a range of academic skill levels of students." *See* 2018 HOD, AR at 10; *see also Savoy*, 844 F. Supp. 2d at 30 ("[T]he Court should 'defer to the [hearing officer's] factual findings unless it can point to contrary nontestimonial extrinsic evidence on the record.'") (citation omitted)).

Sterling-Hunter's observation notes lend further credence to Plaintiffs' concerns about R.B.'s classroom behavior. Her observation notes indicate that R.B. benefits from one-on-one instruction from his teachers. Ex. 1 at 2, Pls.' Mot. for Additional Evidence. However, DCPS is obligated to design an IEP that is reasonably calculated for a student to progress in light of his circumstances, *see Endrew F.*, 137 S. Ct. at 999, in the least restrictive environment. With respect to the type and amount of special education hours, DCPS satisfied this burden by designing an IEP that was tailored to R.B.'s special education needs in the SLS program. The additional evidence accepted by the Court does not change this conclusion.[11]

The Court will grant summary judgment for the District with respect to the amount and type of R.B.'s special education hours.

### 2. *The Use of Assistive Technology*

Plaintiffs assert that R.B.'s May 2017 IEP does not include the assistive technology that R.B. requires. Pls.' Reply at 11. Plaintiffs point out that R.B.'s IEP states: "Assistive technology is not warranted at this time." *See* 5/1/17 IEP, AR at 290. Plaintiffs express particular concern about R.B.'s ability to use a computer at Woodrow Wilson HS. Plaintiffs note that "[t]he need for R.B. to access a computer in the classroom was documented throughout the record and discussed at the May 2017 IEP meeting." Pls.' Reply at 11. Plaintiffs argue that the IEP lacks the inclusion of such technology and, as a result, denies R.B. a FAPE. *Id.*

---

[11] The Court further observes that the student-to-teacher ratio is comparable in special education classes at The Lab School and Woodrow Wilson HS. At The Lab School, R.B.'s classes ranged from six to ten students, with one instructor. 2/1/18 Hearing Tr., AR at 695-96; *see also id.* at 715-19. At Woodrow Wilson HS, SLS classes typically contain between twelve to fifteen students, with an instructor and a special education aide. 2/2/18 Hearing Tr., AR at 815-16; *see also id.* at 879, 882.

Plaintiffs emphasize this concern in briefing their motion. After the 2018 due process hearing, Plaintiffs made essentially the same point, arguing that Woodrow Wilson HS was an improper placement for R.B. because there was "a lack of . . . assistive technology" used in SLS classrooms. *See* Pet'rs' Closing Br., AR at 506-07. Plaintiffs based their argument on a site visit conducted by R.B.'s mother and Ms. Mounce, R.B.'s educational consultant, in October 2017. Plaintiffs stressed that R.B. "need[s] access [to] a computer" and "[R.B.] would not be permitted to use a laptop computer unless it was specified in his IEP." *Id.* Plaintiffs now argue explicitly that R.B.'s IEP is deficient because it does not provide for assistive technology.

The Administrative Record supports the argument that R.B. requires access to a computer to alleviate difficulties with handwriting. *See id.* For instance, R.B.'s 2016 psychological evaluation recommended that, "[g]iven [R.B.'s] difficulty with handwriting, he should be allowed to use the keyboard on writing assignments." 3/20/16 Confidential Comp. Psychological Re-Evaluation, AR at 117. In addition, R.B.'s 2017 occupational therapy annual progress report stated that "[R.B.'s] manuscript skills are . . . inconsistent" and that at The Lab School, "[R.B.] usually uses his school-issued tablet to complete many longer assignments." Apr. 2017 Occupational Therapy Annual Progress Report, AR at 262. Similarly, during R.B.'s May 1, 2017 IEP meeting, Lab School representatives noted that R.B. uses a tablet at the Lab School to support IEP goals related to motor skills and physical development. 5/1/17 IEP Meeting Notes, AR at 274.

DCPS responds that Plaintiffs' claim that the IEP is deficient in this regard is "patently untrue" and that R.B.'s IEP included assistive technology. It notes that the IEP provided for several "classroom aids and services," including the use of "word processing software with spell-check features" and a "calculator." *See* 5/1/17 IEP, AR at 310. DCPS insists

that word processing software and calculators are assistive technology but fails to mention the statement in the IEP that no assistive technology was warranted.[12]

The Court finds that R.B.'s IEP is internally inconsistent and needs clarification for the protection of R.B. and his teachers.  The 2018 HOD recognized that "there is no [assistive technology] listed in [R.B.'s] IEP" but also commented that the IEP required several classroom aids and services, including "word processing software with spell-check features."  2018 HOD, AR at 7-8, 17.  The hearing officer did not appear to see the dichotomy between the two provisions in the IEP; in any event, while he cited both he did not explain how they relate to one another.  Plaintiffs clearly argued that Woodrow Wilson HS was an improper placement for R.B. due to the school's lack of assistive technology, *see* Pet'rs' Closing Br., AR at 506-07, but the hearing officer overlooked the record evidence and, despite the statement from The Lab School, found that Plaintiffs had not raised any concerns about assistive technology at the May 1, 2017, IEP meeting.  He also relied on the fact that R.B.'s IEP stated that assistive technology was not warranted.  2018 HOD, AR at 17.  Because he neither appreciated nor resolved the internal contradictions in the IEP concerning assistive technology, the hearing officer found that Plaintiffs had no basis to argue that Woodrow Wilson HS was an inappropriate placement based on the absence of assistive technology.

Whether Woodrow Wilson HS could, and would, provide necessary assistive technology to R.B. is unknown and the Court makes no such findings.  The IEP would have

---

[12] According to DCPS documentation, "Assistive Technology (AT) is a general term for all individualized technologies that assist students with a disability access the school curriculum or educational environment."  Resource Guide at 30.  The Resource Guide states that "[assistive technology] comes in all shapes and sizes and may range from low-tech solutions, like pencil grips and slant boards, to high-tech devices, like laptops and software."  *Id.*

allowed individual interpretation on an issue that requires clarity for student and teachers.  For this reason, the HOD does not provide sufficient analysis to determine the adequacy of the proposed IEP for R.B.  The Court will remand the matter to the hearing officer to take evidence and resolve the dual statements on assistive technology in R.B.'s proposed IEP and determine if, as clarified, the 2017-2018 IEP is reasonably calculated to address R.B.'s needs, with particular attention to the requirements for assistive technology and the availability of such technology at Woodrow Wilson HS.

### B.  Claim Two: Failure to Provide an Appropriate Placement

Plaintiffs claim that DCPS failed to determine an appropriate educational placement for R.B. when it placed him at Woodrow Wilson HS for the 2017-2018 school year.  The benchmark under IDEA for determining the appropriateness of a student's educational placement is that DCPS "must place the student in a setting that is capable of fulfilling the student's IEP."  *Johnson v. District of Columbia*, 962 F. Supp. 2d 263, 267 (D.D.C. 2013).  "[C]ourts have identified a set of considerations 'relevant' to determining whether a particular placement is appropriate for a particular student, including the nature and severity of the student's disability, the student's specialized educational needs, the link between those needs and the services offered by the school, . . . and the extent to which the placement represents the least restrictive educational environment."  *Branham v. District of Columbia*, 427 F.3d 7, 12 (D.C. Cir. 2005).  School districts "need only demonstrate that the student's placement was appropriate; a placement need not satisfy a parent's every desire and need not represent the best possible programming for the student."  *Middleton v. District of Columbia*, 312 F. Supp. 3d 113, 143 (D.D.C. 2018); *see Kerkam v. McKenzie*, 862 F.2d 884, 886 (D.C. Cir. 1988) ("[P]roof that loving parents can craft a better program than a state offers does not, alone, entitle them to prevail under the Act.").

Plaintiffs do not dispute that Woodrow Wilson HS can provide the hours of special education required by R.B.'s IEP. Pls.' Mot. at 26 ("Nobody argued that Wilson could not fulfill the hours of service on R.B.'s IEP."). Rather, Plaintiffs argue that "there *are not enough [special education] hours* and that the services Wilson can provide are not *appropriate to meet R.B.'s needs*." *Id.*

Plaintiffs contend that the special education classes at Woodrow Wilson HS are inappropriate for R.B. "given the type of instruction provided, the lack of integration of technology, the pace of instruction, the peer group, and the expected level of independence/ participation required of students." 2018 HOD, AR at 6 n.5. Plaintiffs' witnesses also expressed concerns about the ability of R.B. to navigate a public-school building. Ms. Mounce testified that, because of "how his disabilities and weaknesses impact him throughout the day," R.B. "needs a small class and he needs a small building." 2/1/18 Hearing Tr., AR at 625. Ms. Mounce predicted that R.B. would have difficulty making transitions between classes at Woodrow Wilson HS due to his "impulsivity" and "distractibility navigating throughout the hall." *Id.* R.B.'s mother echoed these concerns. *See id.* at 795.

The Court has already addressed the inconsistency in the IEP about R.B.'s use of assistive technology and student access to assistive technology at Woodrow Wilson HS. Plaintiffs' additional concerns go to the methodology of special education instruction at Wilson but the methodology to be employed in the future execution of an IEP is not a question for courts to decide. As the Supreme Court stated in *Rowley*, "courts must be careful to avoid imposing their view of preferable educational methods upon the States." 458 U.S. at 207. "The primary responsibility for formulating the education to be accorded . . . and for choosing the educational method most suitable to the child's needs, was left by [IDEA] to state and local education

agencies in cooperation with the parents or guardian of the child." *Id.* "Therefore, once a court determines that the requirements of the Act have been met, questions of methodologies are for resolution by the States." *Id.* at 208.

Except as noted, Plaintiffs have not claimed that Woodrow Wilson HS cannot provide the services mandated by R.B.'s IEP. *See Johnson*, 962 F. Supp. 2d at 267. Accordingly, while Wilson might not offer the "best possible programming" for R.B., *see Middleton*, 312 F. Supp. 3d at 143, questions about the methodology of instruction cannot be decided by a court.

Plaintiffs' concern about R.B. navigating a public-school building does not justify relief for Plaintiffs. Testimony at the February 2018 hearing indicated that R.B. already makes transitions among various classrooms throughout his school day at The Lab School. 2/1/18 Hearing Tr., AR at 715; *see also id.* at 668. Further, Woodrow Wilson HS staff testified that the majority of the SLS classes are held in the same location, on the center wing of the second floor. 2/2/18 Hearing Tr., AR at 817. Finally, as discussed above, the record supports the HOD's finding that R.B. does not require complete separation from non-disabled students.

The Court will remand this matter to the hearing officer to determine if Woodrow Wilson HS is a proper placement for R.B. in light of whether Woodrow Wilson HS can provide the assistive technology required in R.B.'s IEP.

## IV.    CONCLUSION

The IEP as proposed for R.B. for the 2017-2018 school year contained a critical inconsistency concerning R.B.'s needs for, and his school's obligations and ability to supply, assistive technology. It cannot be approved without a remand for the inconsistency to be addressed and resolved by special educators and the hearing officer. For the reasons stated in this opinion, the Court will deny Plaintiffs' Motion for Summary Judgment, Dkt. 16, and will

grant in part and deny in part the District's Cross-Motion for Summary Judgment, Dkt. 19. This case will be remanded for further proceedings consistent with this Memorandum Opinion. A memorializing Order accompanies this Memorandum Opinion.

Date: September 30, 2019

_____
ROSEMARY M. COLLYER
United States District Judge